UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 2:15-cv-14192-ROSENBERG/LYNCH

DONNA JANE WATTS,

    Plaintiff,

v.

CITY OF PORT ST. LUCIE, FLORIDA, *et al.*,

    Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART THE CITY OF PORT ST. LUCIE'S MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon the Motion for Summary Judgment [DE 32] filed by Defendant City of Port St. Lucie, Florida ("the City"). The Court has reviewed the motion, the City's supplement to the motion [DE 42], Plaintiff's response [DE 44], and the City's reply [DE 46]. As more fully explained below, the Motion is **GRANTED** in part and **DENIED** in part.

Summary judgment is granted for the City as to Plaintiff's claim for negligent supervision (Count III), as Plaintiff admits there is insufficient evidence to support this claim. Summary judgment is also granted for the City as to Plaintiff's Driver's Privacy Protection Act ("DPPA") claim (Count I), insofar as that claim is based on the DPPA violations by Peter Chunn and Edward Glaser. Plaintiff has failed to adduce evidence that Chunn and Glaser were acting with a purpose to serve the City and therefore within the scope of their employment. However, the City's motion for summary judgment is denied as to Plaintiff's DPPA claim, insofar as that claim is based on the DPPA violation by Michael Connor.

### I.    BACKGROUND

Plaintiff's First Amended Complaint generally alleges that after Plaintiff, a Florida Highway Patrol trooper, pulled over and ticketed several police officers, she was harassed and

threatened by fellow law enforcement officers.[1] *See* DE 23. The complaint alleges that Defendants Connor and Glaser, police officers employed by the City of Port St. Lucie, accessed her personal information using the Driver and Vehicle Identification Database ("DAVID"). Count I of the complaint is brought against the City for violations of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, *et seq. Id.* at ¶¶ 1-31. Count III is brought against the City under a theory of common law negligent supervision. *Id.* at ¶¶ 37-46.[2]

The City has moved for summary judgment on Counts I and III. *See* DE 32. In response, Plaintiff admits that she "has not been able to adduce sufficient evidence to prove her claim against the City for common law negligent supervision in Count III," and states that she "withdraws that claim against the City." DE 44 at 6. Accordingly, summary judgment is entered for the City as to Count III.[3] However, Plaintiff does dispute that the City is entitled to summary judgment as to Count I.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The existence of a factual dispute is not by itself sufficient grounds to defeat a motion for summary judgment; rather, "the requirement is that there be no *genuine* issue of *material* fact."

---

[1] In December 2012, Plaintiff filed a single case against over 100 defendants, including the Defendants in this case. *See Watts v. City of Palm Beach Gardens, et al.*, Case No. 12-cv-81406-DMM. In May 2014, the court dismissed that action without prejudice as to all defendants except for the Town of Juno Beach. *See id.* at DE 658. Plaintiff thereafter filed separate actions against the dismissed defendants, several of which are proceeding concurrently in this District. *See Watts v. City of Miami, et al.*, Case No. 15-cv-21271-RNS; *Watts v. Village of Biscayne Park, et al.*, Case No. 15-cv-21291-KMW; *Watts v. City of Miami Beach, et al.*, Case No. 15-cv-21292-RNS; *Watts v. Broward Cty. Sheriff, et al.*, Case No. 15-cv-61112-WJZ; and *Watts v. City of Hollywood, et al.*, 15-cv-61123-CMA.

[2] Count II is brought against Defendants Connor and Glaser, who have not moved for summary judgment.

[3] Although Plaintiff indicates that she is "withdrawing" the negligent supervision claim, Plaintiff has not filed a motion to voluntarily dismiss this claim under Federal Rule of Civil Procedure 41(a)(2). *See generally Arias v. Cameron*, 776 F.3d 1262, 1268 (11th Cir. 2015) (under Rule 41, once a defendant has filed a motion for summary judgment, the plaintiff must obtain permission from the court to voluntarily dismiss her case).

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A dispute is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson*, 477 U.S. at 247-48). A fact is material if "it would affect the outcome of the suit under the governing law." *Id.* (citing *Anderson*, 477 U.S. at 247-48).

In deciding a summary judgment motion, the Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007). Thus, upon discovering a genuine dispute of material fact, the Court must deny summary judgment. *Id.*

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., LLC*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "[t]he non-moving party must make a sufficient showing on each essential element of the case for which he has the burden of proof." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must produce evidence, going beyond the pleadings, to show that a reasonable jury could find in favor of that party. *See Shiver*, 549 F.3d at 1343.

### III.   ANALYSIS

**A.   Undisputed Facts**

In their statements of material facts, *see* DE 32 and 44, the parties agree that the following facts are undisputed:

1. Plaintiff was a Florida Highway Patrol Trooper.

2. Connor, Glaser, and Chunn were employees of the City and are sued in their individual capacity.

3. On August 5, 2011, the Plaintiff pulled over a City of Coral Gables police officer for speeding.

4. On September 19, 2011, the Plaintiff appeared in a Broward County Court to prosecute a speeding ticket against a Miami Beach police officer, and the courtroom was full of police officers (none were officers employed by the City), and the next date Plaintiff was berated on a website (not by any City officers).

5. On October 11, 2011, the Plaintiff pulled over a Miami police officer for speeding.

6. Subsequently, Plaintiff was threatened online, threatened when she needed backup from another Florida Highway Patrol trooper, and received hang-up phone calls and unwanted pizza orders. Suspicious vehicles also stopped by her house.

7. On November 5, 2011 at 6:52 a.m. former Defendant Chunn did one DAVID search of the Plaintiff and viewed two pages (driver's license summary and photograph).

8. On November 5, 2011, at 11:51 p.m. Defendant Glaser did one DAVID search of the Plaintiff and viewed three pages (driver's license photograph, summary and transcript).

9. On November 12, 1011, at 12:55 a.m., Defendant Connor did one DAVID search of the Plaintiff and viewed two pages (driver's license photograph and summary).

10. Chunn, Connor, and Glaser used their City email account and City computers to access Plaintiff's information from DAVID. Connor accessed Plaintiff's information via DAVID while using a City computer in his patrol car.

11.     After an internal investigation, it was determined that Chunn, Glaser, and Connor improperly conducted an authorized search of Plaintiff, they were not conducting a law enforcement investigation, there was no legitimate law enforcement purpose, and they violated City rules and regulations for misuse of department communication facilities, and improper computer use/access of files.

B.      **Vicarious Liability under the DPPA**

The City argues that it is entitled to summary judgment on Count III because Plaintiff has not produced sufficient evidence to hold it vicariously liable for the DPPA violations committed by Chunn, Glaser, and Connor. The DPPA establishes a cause of action against "[a] person who knowingly obtains, discloses, or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter" by "the individual to whom the information pertains[.]" 18 U.S.C. § 2724(a); *see also* 18 U.S.C. § 2721(b)(1) (establishing permissible uses for such information). Federal courts have held that the DPPA implicitly recognizes a *respondeat superior* theory of liability against municipalities. *See Watts v. City of Hollywood, Florida*, --- F. Supp. 3d ---, No. 15-61123-CIV, 2015 WL 7709671, at *6-7 (S.D. Fla. Nov. 17, 2015); *see also Margan v. Niles*, 250 F. Supp. 2d 63, 75 (N.D.N.Y. 2003).

In *Santarlas v. Minner*, No. 5:15-CV-103-OC-30PRL, 2015 WL 3852981, at *4 (M.D. Fla. June 22, 2015) ("*Santarlas I*"), the court addressed the standard to be applied in determining vicarious liability under the DPPA:

> "[T]he [Supreme] Court has assumed that, when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules." *Meyer v. Holley,* 537 U.S. 280, 285, 123 S.Ct. 824, 154 L.Ed.2d 753 (2003). Under traditional principles of vicarious liability, to hold an employer vicariously liable for the acts of its employees, the acts must have been taken *within the employee's scope of employment*. *Id.* (citing *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 756, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)).

5

*Id.* at *4 (emphasis added). In a later order, the same court held:

> An employee's conduct is considered to be within the scope of employment if it (1) is of the kind he or she is employed to perform, (2) occurs substantially within the authorized time and space limits of the workplace, and (3) is actuated, at least in part, by a purpose to serve the employer.

*Santarlas v. Minner*, No. 5:15-CV-103-OC-30PRL, 2015 WL 5896243, at *2 (M.D. Fla. Oct. 7, 2015) ("*Santarlas II*") (emphasis added); *see also Watts*, 2015 WL 7709671, at *6-7 (applying same test).

C.  **Whether the DPPA violations committed by Connor, Glaser, and Chunn were within the scope of their employment**

The City raises three arguments as to why Connor, Glaser, and Chunn were not acting within the scope of their employment. First, it argues that it is entitled to summary judgment on Count I because "[t]here is no allegation that accessing driver's [sic] personal information *for reasons not permitted under the DPPA* is the type of conduct for which Connor or Glaser were hired to perform." DE 32 at 8 (emphasis added). Courts have rejected this argument under "the common-sense idea [that] municipal employees would not be hired to do something illegal, nor would their illegal acts presumptively be in furtherance of their employer's interests." *Watts*, 2015 WL 7709671, at *6. Simply because an employee's act was illegal does not mean that the act falls outside the scope of their employment. This reasoning "would open a huge gap in respondeat superior liability, if not eviscerate it." *Id.*; *see also Grider v. City of Auburg, Ala.*, 618 F.3d 1240, 1261 (11th Cir. 2010) ("[T]he question of whether a defendant acted within the scope of his employment is distinct from whether the defendant acted unconstitutionally. The scope-of-employment inquiry is whether the employee police officer was performing a function that, but for the alleged constitutional infirmity, was within the ambit of the officer's scope of authority (i.e., job-related duties) and in furtherance of the employer's business."). Accordingly, this argument is without merit.

6

Second, the City argues that "there is no record evidence as to how accessing Plaintiff's information serves the City or furthers the alleged interests of the City," and there is no evidence that Defendants Connor or Glaser "accessed Plaintiff's information due to a motivation to serve" the City. DE 32 at 8-9. Plaintiff offers two responses to the City's argument that Connor and Glaser's DPPA violations did not further the City's interests.

Plaintiff responds that "[a]n exception may exist where the tortfeasor was assisted in accomplishing the tort by virtue of the employer/employee relationship." DE 44 at 4 (citing *Iglesia Cristiana La Cases Del Senor, Inc. v. L.M.*, 783 So. 2d 353, 357 (Fla. Dist. Ct. App. 2001) and *Nazareth v. Herndon Ambulance Serv., Inc.*, 467 So. 2d 1076, 1078 (Fla. Dist. Ct. App. 1985)). Plaintiff argues that because Connor and Glaser "used their employer/employee relationship to access [Plaintiff's] information via the City's computers, their employment email accounts, and their access to DAVID by virtue of their employment relationship with the City," this "obviat[es] the need for motivation to further the City's interests." DE 44 at 5.

Plaintiff misinterprets the "exception" language from *Iglesia* and *Nazareth*. These cases considered whether a victim of sexual assault could sue the employer of the assailant under a theory of *respondeat superior*. The courts noted that, while generally assaults and batteries by employees are held to be outside the scope of their employment, and therefore insufficient to impose vicarious liability, an exception may exist where the tortfeasor was assisted in accomplishing the sexual assault or battery by virtue of the employer/employee relationship. *See Iglesia*, 783 So. 2d at 357; *Nazareth*, 467 So. 2d at 1078; *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 756 (1998) ("In applying scope of employment principles to intentional torts, however, it is accepted that 'it is less likely that a willful tort will properly be held to be in the course of employment and that the liability of the master for such torts will naturally be more limited.' F. Mechem, Outlines of the Law of Agency § 394, p. 266 (P. Mechem 4th ed. 1952).").

7

These cases are therefore distinguishable from the present case, which does not involve an intentional tort of this type.

Moreover, district courts have rejected similar arguments by DPPA plaintiffs, holding, "[T]he mere fact that the individual defendants had access to DAVID through their employment with the City is insufficient to establish that the conduct was actuated by a purpose to serve the employer." *Santarlas II*, 2015 WL 5896243, at *2; *see also Watts v. City of Hollywood, Florida*, --- F. Supp. 3d ---, No. 15-61123-CIV, 2015 WL 7709671, at *7 (S.D. Fla. Nov. 17, 2015) ("Like the plaintiff in *Santarlas II,* Watts seems to attribute to Wadsworth a motive to serve the City merely because Wadsworth had access to DAVID through his employment with the City.. . . This overly broad argument fails, as it did in *Santarlas II,* because it does not account for the obvious possibility an employee could use an employer's resources for entirely personal reasons.").

Additionally, Plaintiff responds that Connor's access of Plaintiff's information did further the City's interests, based on his deposition testimony. *See* DE 44 at 5-6. The Court notes that Plaintiff makes no argument that Glaser or Chunn acted with a purpose to serve the City. Both testified that they accessed Plaintiff's DAVID record out of personal curiosity to see if they knew her, after hearing news reports about the traffic stops described *supra*. *See* DE 45-5 at 3-4 (Chunn Deposition); DE 45-6 at 4 (Glaser Deposition). The Court finds that Glaser and Chunn were not acting within the scope of their employment when they accessed the DAVID records; the City therefore cannot be held vicariously liable for their DPPA violations.

With regard to Defendant Connor, Connor testified that he had seen a video of one of the traffic stops that Plaintiff conducted that allegedly led to the harassment described *supra*, and in that video Plaintiff had ordered a uniformed officer out of his marked patrol car at gun point. *See* DE 45-4 at 4. He testified that he accessed Plaintiff's DAVID records in order to see more clearly what Plaintiff looked like so that, in the event she was working in Defendant Connor's area and

8

pulled out her firearm, he would be less likely to shoot her or escalate the situation in a way that could endanger her, himself, or fellow officers:

> A. I was -- after seeing the article, there had been a news article and a video posted where I had observed two police officers, one being [Plaintiff] and another from the City Miami or Miami-Dade, I cannot remember the agency right now, where an officer had been the subject of a traffic stop. A uniformed officer in his marked patrol car was pulled out at gunpoint in this traffic stop.
> *I thought it was pertinent for me to have as much information for me for officer safety purposes and just my own well being* of incidents going on with police work or, you know, what was going on -- I'm trying to think of the right verbiage for this, just to have information available for an incident like that.
> . . .
> Q. But were your interests purely selfish or did you think there was a benefit for your colleagues in the department?
> A. *No, I didn't discuss it with my colleagues in the department. It was purely for me, I was looking out for myself.* The fact that she worked for the Florida Highway Patrol and were relatively close to the Miami-Dade County and that it was such a big media blitz, I didn't see it outside the realm of possibilities for her to even be in this area working, temporarily, permanently, whatever, just until things could have calmed down or whatever. Not working for FHP, I'm not privy to certain informations [sic] like that. But if there was a possibility she could be working in this area, *I definitely wanted to make sure my safety was looked after*, *it sounds funny, but her safety also.*
> After what I had seen on the video, I definitely had some safety concerns and *I didn't want to put myself in an unsafe situation or put another officer in an unsafe situation*.
> Q. But if you had found some kind of safety -- some way that you could have improved officer safety, would you have shared that with your colleagues?
> . . .
> THE WITNESS: The reasons were personally me. I'm worried about my personal safety when I'm on a scene. I can't protect other officers when I'm not there so I don't necessarily worry about what's going on with those officers when they're not there, but *if I see an officer pointing a gun at another officer or if an officer points a gun at me, our policy and procedure says if someone points a gun at you, that's a deadly force situation. And if I don't know what's going on and I see someone pointing a gun at me, I just might as well point a gun back.*
> *I don't want to see something bad happen due to a misunderstanding or a miscommunication, either me getting hurt or somebody else getting hurt*, or if I show up on scene and see a similar situation, I don't want to put myself in a dangerous situation or somebody else in a dangerous situation, so it's really on me in my own best tactics. I'm not a defensive tactics or an officer safety instructor I just merely looked for myself.
> Even though I do put myself in unsafe situations, sometimes it's inadvertent, sometimes I'm just not paying attention to the situation I'm in, my surroundings, but I always try to be cognizant of it. If I put myself in a dangerous

9

> situation, I try to improve on that so the next time I'm in a similar situation to try not to make that same mistake twice to ensure that I get to the end of my shift and that my partners and officers out there with me also make it home.

*Id.* at 4-7 (emphasis added).

Plaintiff argues, "Connor admits that his conclusions derived from his accessing of [Plaintiff's] restricted information from DAVID would be used to further the interest of the City by enhancing the safety of him and all other City officers." DE 44 at 6. The Court finds that this testimony raises a question of fact as to whether Connor was motivated by a purpose to serve the City by improving officer safety and his performance as a police officer. *Cf. McCrae v. Broward Sheriff's Office*, No. 15-61927-CIV, 2016 WL 1055093, at *6 (S.D. Fla. Mar. 15, 2016) ("Plaintiff has alleged facts sufficient to show that the information retrievals were for an impermissible purpose, but within the scope of employment and in furtherance of the City's or BSO's interests, that is, the desire to be a better-prepared witness."). "[W]here there is a 'relationship between the employee's wrong and the employer's interests,' the scope of employment question is one of fact and is properly submitted to the fact-finder." *Andersen v. United States*, No. 09-60364-CIV-GOLD, 2009 WL 6633307, at *5 (S.D. Fla. Oct. 21, 2009); *see also Santarlas I*, 2015 WL 3852981, at *4 ("An employee is acting within the scope of his or her employment when the 'employee's purpose, *however misguided*, is wholly or in part to further the master's business.' ") (emphasis added). Accordingly, the City's motion for summary judgment is denied, insofar as Plaintiff's DPPA claim against the City rests on the DPPA violation of Defendant Connor.

## IV.  CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED** that:

1. The City's Motion for Summary Judgment [DE 32] is **GRANTED** in part as to Count I, insofar as that claim is based on the DPPA violations committed by Glaser and Chunn. The City cannot be held vicariously liable for these violations because Glaser and Chunn were not acting within the scope of their employment.

2. The City's Motion for Summary Judgment [DE 32] is **DENIED** in part as to Count I, insofar as that claim is based on the DPPA violation committed by Connor. There is a dispute of fact as to whether Connor was acting within the scope of his employment.

3. The City's Motion for Summary Judgment [DE 32] is **GRANTED** in part as to Count III, as Plaintiff admits there is insufficient evidence to support this claim.

**DONE AND ORDERED** in Chambers, Fort Pierce, Florida, this 22nd day of March, 2016.

Copies furnished to:
Counsel of record

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE